UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARY CHAMBERS, </br></br> Plaintiff, </br></br> v. </br></br> CAROLYN W. COLVIN, </br></br> Defendant. | ) </br> ) </br> ) </br> ) </br> ) </br> ) Civil Case No. 16-1059 </br> ) </br> ) </br> ) </br> ) </br> ) |

**MEMORANDUM OPINION**

After considering a record crisscrossed with seventeen different medical, psychological, and vocational providers, the Social Security Administration deemed Mary Chambers ineligible for disability benefits or supplemental income because she did not meet the agency's definition of a disabled individual. She now appeals, arguing that Administrative Law Judge F. H. Ayer ("the ALJ") improperly weighed the evidence and that he failed to consider Chambers's work history in evaluating her credibility. But the ALJ hewed closely to agency policy and reached a conclusion supported by substantial evidence. Because it is not the role of the courts to second-guess the ALJ's judgment, the Court affirms.

**I. Factual Background**

For almost three decades, Chambers served the Washington, D.C. government as a full-time support specialist. By all accounts, she was an exemplary employee, consistently earning a $40,000 to $65,000 salary.

Chambers now seeks benefits and supplemental income for a disability she claims began in November 2014, shortly after she suffered a transient ischemic attack (popularly referred to as a ministroke) and quit her job due to stress. Around the same time, her doctors also diagnosed

her with sleep apnea, hypertension, cerebral small vessel disease, and coronary artery disease. By then a fifty-one-year-old smoker, she also suffers from arthritis, osteopenia (a bone loss condition), fatty liver disease, bladder wall thickening and infection, urethral narrowing, sciatica, tremors, chronic fatigue, cataracts, dry eyes, nearsightedness, age-related farsightedness, and eye inflammation tied to allergies.

In her testimony before the ALJ, Chambers reported shortness of breath; a racing heart; tingling, pain, and mild weakness in her extremities; and difficulty ascending stairs and standing for long periods. She also described frequent headaches, which she treats by lying down with a vinegar-soaked rag. (She claimed that this relieves her symptoms, and that she does not want headache medication since she thinks she already takes too many pills.)

Her doctors paint a more varied picture. In November 2014, after Chambers went to the emergency room with persistent headaches and facial numbness, an internist attributed Chambers's headaches to hypertension and found her able to walk, climb stairs, drive, and lift less than fifteen pounds. Two months later, however, a neurologist mistakenly diagnosed her with multiple sclerosis and advised her to cease work. A month after that, her family physician reported Chambers felt fine. Even still, when she saw a psychologist a few weeks after that, he described her as totally disabled and unable to work. But by the time she saw a second cardiologist a few months later, Chambers said she had no pain at all. And during the summer and fall of 2015, Chambers saw several more doctors, all of whom reported unremarkable examinations and noted her relative lack of self-reported impairment.

In addition to her physical maladies, Chambers has a mental impairment—variously diagnosed as post-traumatic stress disorder or anxiety—that mildly restricts her daily living activities and causes her moderate difficulties in social functioning, concentration, persistence,

2

and pace. According to her testimony, this mental condition—not her physical impairments—led her to quit her job: she reported being threatened as a persistent whistleblower in a hostile environment, and she attributes her ministroke to the attendant stress. She also testified to feeling claustrophobic and suffering consistent panic attacks. Luckily, she has not experienced any decompensation episodes and is undergoing treatment.

Despite these impairments, Chambers does her best to continue a normal routine. She continues to dress, bathe, and groom herself independently. She attends church, watches television, visits her grandchildren, launders and irons her clothes, cleans the bathroom, does the dishes, and walks on the treadmill to lose weight. She sleeps roughly seven hours each night and denies experiencing daytime fatigue.

## II. Prior Administrative Proceedings

After considering the entire record, the ALJ found her cumulative impairment less severe than the impairments described in 20 C.F.R. Part 404, Subpart B, Appendix 1. Moreover, the ALJ found Chambers could perform light work, as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b), albeit with minor restrictions. And although those restrictions prevented her from resuming her previous job, the ALJ pointed to numerous other positions well-suited for Chambers's age, education, experience, and functional capacity. As a result, the ALJ concluded Chambers was not disabled under 42 U.S.C. §§ 416(i), 423(d), or 1382c(a)(3)(A).

After unsuccessfully seeking review by the agency's Appeals Counsel, Chambers filed this suit under 42 U.S.C. § 405(g).

## III. Standard of Review

Section 405(g) limits our review to determining whether the ALJ correctly applied the relevant legal standards and whether substantial evidence supports the ALJ's findings. To

facilitate this review, Social Security regulations require the ALJ to reconcile the claimant's testimony with the medical evidence and—if his final "assessment conflicts with an opinion from a medical source"—to "explain why th[at] opinion was not adopted." *See* SSR 96-8P, 61 Fed. Reg. 34474 (July 2, 1996).

The substantial evidence standard "requires more than a scintilla, but . . . less than a preponderance," *FPL Energy Me. Hydro LLC v. F.E.R.C.*, 287 F.3d 1151, 1160 (D.C. Cir 2002). It can be satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## IV. Analysis

To be sure, Chambers suffers from serious impairments caused by her physical and mental health. But having an impairment is not the same as being disabled. Because the ALJ correctly applied the agency's definition of a disabled individual, and because he carefully evaluated the administrative record to make factual findings supported by substantial evidence, the Court affirms.

### A. The ALJ correctly applied the Social Security Administration's definition of a disabled individual, and his findings are supported by substantial medical and testimonial evidence.

The ALJ's conclusion that Chambers was ineligible for disability benefits or supplemental income passes muster under agency policy and the evidentiary standard. Under 20 C.F.R. §§ 404.1520 and 416.920(b), there are five steps to determine whether an individual's impairment arises to a disability. First, an ALJ considers the person's work activity. If the person is engaging in substantial gainful activity, they are not disabled.

4

Second, the ALJ considers the severity of the person's impairment. If the impairment does not significantly limit their ability to do basic work activities for twelve months, they are not disabled. *See also* §§ 404.1509, 416.909.

Third, the ALJ compares the person's impairment to the impairments listed in 20 C.F.R. Part 404, Subpart B, Appendix 1. That voluminous appendix taxonomizes various physical and mental disorders by impairments. If the person's impairment meets or equals the severity of one of the listed impairments, the analysis stops there: the person is disabled. If not, the analysis continues.

Fourth, the ALJ considers the person's ability to perform sustained physical or mental activities in light of their impairment. If the person can continue working as they did within the fifteen years prior to their impairment's onset, they are not disabled.

Fifth, if the person cannot continue working as they did within the fifteen years prior to their impairment's onset, the ALJ considers whether the person can do any other work in light of their impairment, age, education, and experience. If so, the person is not disabled.

After correctly identifying this standard, the ALJ sought to apply it. He determined, based on Chambers's testimony and earnings records, that she had not engaged in substantial gainful activity since November 2014.

The ALJ carefully sifted through Chambers's testimony and her medical records to determine six impairments significantly limiting her ability to perform basic work activities for at least twelve months: sleep apnea, hypertension, cerebral small vessel disease, coronary artery disease, her ministroke, and her mental impairment. But based on Chambers's medical records, the ALJ determined the cumulative impairment did not meet or equal the impairments listed in 20 C.F.R. Part 404, Subpart B, Appendix 1.

The ALJ further determined—weighing Chambers's testimony and an exceptionally thorough examination of her medical records—that Chambers could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk for six hours in an eight-hour period, sit for six hours in an eight-hour period, occasionally crawl, and frequently stoop, kneel, or crouch. Given this functional capacity, which largely meets the definition of light work under 20 C.F.R. § 404.1567, the ALJ concluded Chambers could work in an office setting limited to simple, routine, and repetitive tasks with occasional contact with coworkers and no contact with the public.

Drawing on testimony by Chambers and a vocational expert, the ALJ determined that although Chambers could not resume her previous job, many jobs in the national economy were well suited to a candidate with her age, education, experience, and ability. Thus, the ALJ concluded, Chambers fell short of the Social Security Act's definition of a disabled individual. Thanks to the ALJ's detailed citations to Chambers's testimony and her doctors' statements, it's clear his conclusion was properly supported by substantial evidence.

### B. None of Chambers's claims on appeal amount to reversible error in light of the standard of review.

"A federal court may not reweigh the evidence presented to it when reviewing a disability claim decision made by the Social Security Administration, nor may it replace the Secretary's judgment concerning the weight and validity of the evidence with its own." *Davis v. Heckler*, 566 F. Supp. 1193, 1195 (D.D.C. 1983) (Hens Green, J.). Simply put, considering the standard of review, Chambers's contentions do not amount to reversible error.

Chambers, for instance, argues the ALJ gave too much weight to opinions by two of the three doctors who conducted the agency's initial disability determination. Though these examinations happened over three months after the onset of her impairment, Chambers

continued to see different doctors for several more months, so she argues "there is simply no way of knowing what the consultants would have opined if they had access to the far more substantial . . . record considered by the ALJ." Pl.'s Br. at 15. True enough, but it is neither the ALJ's job nor this Court's role to guess what a theoretical doctor might have concluded based on evidence the real doctor didn't have. The ALJ correctly weighed the record as it stood, and this Court cannot second-guess his decision to credit these opinions as "consistent with a longitudinal review of the credible evidence." Op. at 15.

Chambers also objects to the ALJ's treatment of opinions by Drs. Joel Taubin, D. Giovanni Scott, Ruwani Gunawardane, and James Ballard—four of the fifteen doctors named in the ALJ's opinion. Chambers claims the ALJ both improperly disregarded Dr. Taubin's opinion and inadequately explained his decision to do so. Further, Chambers claims the ALJ's determination of her functional capacity failed to account for Dr. Scott's description of her psychological limitations. And finally, Chambers argues opinions by Drs. Gunawardane and Ballard (the only two doctors who recommended Chambers stop working because of her impairment) should trump the opinions of other doctors since they are specialized physicians who actually treated Chambers.

Each objection fails. For one, the ALJ did engage with the substance of Dr. Taubin's findings to explain why he properly accorded some (not all) of Dr. Taubin's conclusions little weight. As the ALJ notes, the disregarded "findings" largely recite subjective complaints presented by Chambers to Dr. Taubin but contradicted by objective evidence and by other subjective statements made by Chambers. And the rest of Dr. Taubin's findings are not inconsistent with the ALJ's determination of Chambers's functional capacity. The ALJ's opinion thus easily cleared the then-operative hurdle of Social Security Ruling 96-2p, which requires

"specific reasons for the weight given to the treating source's medical opinion . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." 61 Fed. Reg. 34490 (July 2, 1996), *rescinded by* 82 Fed. Reg. 15263 (Mar. 27, 2017).

As for the weight afforded to Dr. Scott's testimony, Chambers herself recognizes "'[t]he reaction to the demands of [stress] is highly individualized'" and thus "the ability to adapt to the demands . . . of the workplace is not *necessarily* accounted for by reducing the individual to a lower stress level." Pl.'s Br. at 21 (quoting SSR 85-15, SSR Cum. Ed. 1985 (second alteration in original)) (emphasis added). This statement aptly illustrates why her argument does not amount to reversible error. In concluding Chambers's mental disorder limits her to performing "simple 1-4 step, routine, repetitive tasks in a work environment where there would only be occasional contact with co-workers and supervisors and no contact with the general public," Op. at 6, the ALJ made precisely the individualized determination agency policy requires. And this determination is no less valid just because the ALJ "never presented" Dr. Scott's testimony "in a hypothetical to a vocational expert." Pl.'s Br. at 21. In fact, as the ALJ noted, Dr. Scott's opinion is "largely consistent with the . . . [ultimate] capacity determin[ation]." Op. at 16. Chambers merely masks her disagreement with the ALJ's conclusion by pretending he didn't give Dr. Scott's testimony enough weight.

Similarly, although Chambers correctly cites caselaw and regulations supporting the proposition that opinions by specialized physicians who treat claimants are ordinarily afforded great weight, no rule requires those opinions to predominate over thirteen other medical opinions pointing the other way. Great weight does not mean conclusive weight, and the ALJ's adequately

articulated–decision to discount Drs. Gunawardane and Ballard's opinions does not amount to reversible error, particularly given how cursory their opinions were.

Chambers's final argument—that § 404.1529(c) and Social Security Rulings 96-7p and 96-8p required the ALJ to consider her credibility in light of her work history—misreads those policies, which merely suggest work history as one of many things an ALJ can properly consider in evaluating the claimant's credibility. And in any event, the ALJ did not ignore her work history: he mentioned it multiple times while weighing the evidentiary record. Nor did the ALJ reflexively dismiss Chambers's claims as incredible: he ultimately accepted almost all her claimed limitations, still concluding they did not amount to a disability.

## V. Conclusion

From seventeen different medical, psychological, and vocational experts considered in the ALJ's opinion, Chambers plucks her favorite six and claims the ALJ didn't give them enough weight. She also claims the ALJ didn't properly consider her work history, when really he just didn't account for it in the way she wanted. Neither contention amounts to reversible error. Because the ALJ correctly identified and applied the administrative definition of a disabled person, and because he supported his conclusions with substantial evidence, the Court affirms. A separate order will issue.

Date: October 12, 2018

Royce C. Lamberth
United States District Judge

9